UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2003 DEC 23  A 11: 43

U.S. DISTRICT COURT
DISTRICT OF MASS.

SANDY J. BATTISTA,

    Plaintiff,

vs.

ROBERT MURPHY, Superintendent,; and
MICHAEL T. MALONEY, Commissioner of
Corrections, in their individual and
official capacities,

    Defendant's.

)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION
NO.

03 12649 MEL

**V E R I F I E D   C O M P L A I N T**

Plaintiff, Sandy J. Battista, a involuntarily civilly committed resident, under G.L. Ch.123A, §14(d), as amended, states:

INTRODUCTION:

This is a Civil Rights Action for damages and injunctive relief under 42 U.S.C. §1983, alleging a "controversy" between the parties, whereas, the plaintiff maintains that, as she is civilly committed, she is statutorily and constitutionally entitled to greater due process protections to any and all treatment and rehabilitation that would reduce her risk to re-offend sexually, including, but not limited to "surgical castration(-orchiectomy)." The plaintiff also alleges that the defendant's have a statutory obligation under Ch.123A, to "do all that can be done to treat and rehabilitate" her "as soon as possible" and under the "least restrictive conditions necessary to achieve the purpose of commitment." Defendant's maintain to the contrary.

The plaintiff further alleges that, the defendant's failure to allow her the right to elect "surgical castration (orchiectomy)," at her own expense, during her civil commitment proceedings, under G.L. Ch.123A, interfered with her right to present a "legitimate avenue of defense," and placed restrictions on her ability to meet the State's case against her, in violation of her State and Federal Constitutional Rights.

JURISDICTION:

This Court has jurisdiction over the subject matter of the enclosed Complaint pursuant to 28 U.S.C. §§§1331-32 and 1343, and any other jurisdiction that this Court may deems just in the proper.

This Court has supplemental jurisdiction over the plaintiff's State Law Claims pursuant to 28 U.S.C. §1367, and any other supplemental jurisdiction that this Court may deem just in the proper.

PARTIES:

1) The Plaintiff, Sandy J. Battista("Battista"), is and was at all times relevant to this Complaint a citizen of the United States and of the Commonwealth of Massachusetts, a involuntarily civilly committed resident, under G.L. Ch.123A, §14(d), as amended, committed to the Massachusetts Treatment Center, located at 30 Administration Rd., Bridgewater, County of Plymouth, Mass. 02324. (Hereinafter "MTC"). The plaintiff sues in her own behalf.

2) The Defendant, Robert Murphy("Murphy"), is and was at all times relevant to this Complaint the Superintendent of the MTC. Upon information and belief, defendant Murphy is legally responsible for the day-to-day operations of the MTC, and for implementing the "care, custody, treatment and rehabilitation" of all those residents civilly committed under G.L. Ch.123A housed at the MTC, including the plaintiff. Defendant Murphy has acted under "color of state law" at all times relevant to this Complaint, and is sued in his individual and official capacities.

3) The Defendant, Michael T. Maloney("Maloney"), is and was at all times relevant to this Complaint the Commissioner of Corrections for the Commonwealth of Massachusetts, located at 50 Maple Street, Suite 3, Milford, Mass.    . Upon information and belief, defendant Maloney is legally responsible for the oversight and custody of all criminally and civilly committed inmates and residents in the Massachusetts Correctional System. Upon further information and belief, defendant Maloney is additionally legally responsible for promulgating rules, regulations, policies and procedures for all state correctional facilities, including the MTC, and to ensure compliance and investigate any non-compliance therefrom. Defendant Maloney has acted under "color of state law" at all times relevant to this Complaint, and is sued in his official capacity.

FACTS:

4) On 2/28/83, plaintiff pled guilty in the Worcester

-4-

County Superior Court to grand jury indictment nos.83-101-
423-24-25, charging one count of Rape of a Child(unnatural);
one count of Kidnapping; and one count of Robbery(not being
armed). Plaintiff received current sentences of 12-20 years
in MCI-Walpole State Prison.

    5) On 7/1/97, while incarcerated, plaintiff filed a pro-
se Civil Complaint with the Clerk's Office for the County of
Suffolk, alleging in part that, the Department of Correction
("DOC") had been "deliberately indifferent" to her "serious
medical needs" as a "self-diagnosed 'Transsexual.'" See <u>Sandy
J. Battista vs. Commonwealth of Massachusetts, et al.,</u> Suff.
Sup.Ct.C.A.No.97-3487-A. (On file).

    6) On 6/1/98, the Suffolk County Superior Court (Burnes,
J.), in granting defendant's Summary Judgment, held in relevant
part that, ...it was unlikely that the plaintiff would be able
to prove at the trial of this action that she suffered from
Transsexualism, as she admittedly was "self-diagnosed," and
that the counseling being offered to her by the defendant's was
adequate under the Eighth Amendment. <u>Id.</u>

    7) On 5/24/01, just five days prior to plaintiff being
discharged from her criminal sentences of incarceration ment-
ioned above, the Worcester County District Attorney's Office
filed it's ex parte Petition seeking a determination as to her
alleged "sexual dangerousness," under G.L. Ch.123A, §§1, 12-
16, as amended. See <u>Commonwealth vs. Sandy J. Battista,</u> WORCV-
01-1108-C. (On file).

8) On 5/29/01, plaintiff was discharged from her above mentioned criminal sentences of incarceration, and therefore, as of date, is no longer a "prisoner," as that term is legally defined.

9) On 8/8/01, while temporarily civilly committed, plaintiff was seen at the Lemuel Shattuck Hospital ("LSH") for examination and repair of a hernia. Exhibit-1.

10) During this examination, plaintiff informed the examining physician that she was a "Transsexual," and requested to be "surgically castrated" along with her hernia repair. The examining physician recommended that plaintiff be seen at the Urology Clinic. Id.

11) On 9/10/01, in response to this recommendation, plaintiff made written request upon defendant Murphy to elect "surgical castration," at her own expense. Exhibit-2.

12) In response to plaintiff's request, defendant Murphy referred plaintiff to the MTC's in-house Mental Health Director, who in-turn, referred plaintiff to the MTC's in-house Consulting Medical Psychiatrist. Exhibit-3.

13) On 9/18/01, the MTC's in-house Consulting Medical Psychiatrist, Dr. Bauermeister, M.D., informed defendant Murphy, in writing, that plaintiff should be allowed to be seen by "somebody outside MTC, i.e., an 'independent expert,'" to be "counseled on the 'emotional and physical consequences of castration." Id.

14) On 9/19/01, defendant Murphy arbitrarily second guessed the above professional medical judgment, and denied plaintiff's

request to be "surgically castrated," and the recommendations
of his own medical personnel, as a direct result from his own
referral. Exhibit-4.

15) In and around September of 2001, as a result of def-
endant's Murphy's refusal to comply with his own medical per-
sonnel's above recommendations, plaintiff hired her own "Gender
Specialist," at her own expense. Exhibit-5.

16) The "Gender Specialist," a Diane Ellaborn, LICSW,
with 22 years experience in treating persons afflicted with
gender issues, diagnosed plaintiff as suffering from "Gender
Identity Disorder(NOS)," and recommended that plaintiff be
allowed to be "surgically castrated," and placed on "female
hormones." Exhibit-6.

17) The above expert, Ms. Ellaborn further opined that
not only would this treatment help resolve plaintiff's per-
sistent gender dysphoria, but would also "reduce her risk of
re-offending sexually." Id.,(at In Conclusion).

18) On 10/30/01, plaintiff again made written request
upon defendant Murphy, this time attaching a copy of the above
expert's Report, requesting that he reconsider his denial of
plaintiff's previous request to elect "surgical castration,"
at her own expense. Exhibit-7.

19) On 11/27/01, defendant Murphy denied plaintiff's re-
quest for reconsideration. Exhibit-8.

20) On 1/17/02, plaintiff filed her pro-se Civil Complaint
with the Clerk's Office of the United States District Court,
alleging in relevant part that, ...the MTC staff and adminis-

trative official's had violated her due process rights and were deliberately indifferent to her serious medical needs, as a "involuntarily temporarily civilly resident," under G.L. Ch.123A. See Sandy J. Battista vs. Robert Murphy, et al., U.S. Dist.Ct.C.A.No.02-CV-10137-MEL. (On file).

21) On 11/4/02, this Court (Lasker, J.), in granting defendant's Motion to Dismiss the Complaint, held in relevant part that, ...plaintiff's claims of treatment for her "gender issues" are barred under the Doctrine of Res Judicata, though held that, ...plaintiff's due process claims were not "ripe" for adjudication,..."prior to a definite order to civilly commit her would be premature." (A copy of this decision is attached for this Court's convenience and marked as Exhibit-9).

22) On 5/15/03, the Worcester County Superior Court (-Sweeney, J.), upon a Judgment on Jury Verdict, adjudicated plaintiff as being a "Sexually Dangerous Person," and civilly committed her to the MTC, for a period of one day-to-life, or until discharged under section 9 of ch.123A. Exhibit-10.

23) Prior to plaintiff's trial of her civil commitment proceedings, she was examined by two (2) state examiner's, for the purpose of examinations, evaluation, diagnosis and written report and testimony before the court on her alleged "sexual dangerousness."

24) On 4/1/02, one (1) of the above mentioned state examiner's, Dr. Katrin (Rouse) Weir, Md.D., in assessing plaintiff's alleged "sexual dangerousness," opined that, plaintiff's "gender issues appeared to have some 'biological basis,'" though

he "clearly has a complex network of issues related to this,
which he needs to work through." Exhibit-11(at page-14).

25) Dr. Weir further opined that "surgical castration"
would clearly "reduce plaintiff's risk of re-offending sex-
ually." Id.

26) Plaintiff's civil commitment was premised, in part,
on her "gender issues."

27) Defendant's have a statutory obligation under G.L.
Ch.123A to "do all that can be done to treat and rehabilitate"
plaintiff, "as soon as possible," and under the "least rest-
rictive conditions necessary to achieve the purpose of commit-
ment."

28) Upon information and belief, defendant Maloney has
instituted a "system wide" policy of arbitrarily and absolutely
forbidding any person afflicted with gender issues, including
the plaintiff, from being treated by a qualified personnel, who
provides services that are of a quality acceptable when measured
by prudent professional standards within the relevant scientific
community.

29) The defendant's have acted in a manner which treats
this plaintiff, because of the nature of her condition, diff-
erently from other residents suffering from equivalent conditions.

30) Had defendant Murphy allowed plaintiff to elect "sur-
gical castration," at her own expense, while temporarily civi-
lly committed, her "risk of re-offending sexually" would have
been eliminated, as studies reveal that the risk of re-offending
among castrated sex offenders is virtually nil.

31) As a proximate and foreseeable result of defendant
Murphy's refusal to allow plaintiff the right to elect surg-
ical castration while temporarily civilly committed, the plain-
tiff was denied her constitutional right to "effective assist-
ance of counsel," in that, she was deprived of the right to
present a "legitimate avenue of defense" at the trial of her
civil commitment proceedings.

32) As a proximate and foreseeable result of defendant
Murphy's refusal to allow plaintiff the right to elect Surg-
ical castration, the plaintiff has been denied the opportunity,
and will continue to be denied the opportunity to eliminate
risk factors during the course of her civil commitment.

33) In spite of repeated efforts by the plaintiff on re-
questing the right to elect surgical castration, the defendant's
have acted in a manner which has caused, and will continue to
cause plaintiff's continued civil commitment and deprivation
of liberty.

34) Persons civilly committed under G.L. Ch.123A, including
the plaintiff, have a "greater due process right" to "treatment
and rehabilitation," than prisoners criminally incarcerated.

35) The acts of the defendant's have been conscious, re-
peated and have intentionally caused the plaintiff both personal
financial loss, and extreme emotional distress.

THE PLAINTIFF DEMANDS A TRIAL BY JURY.

CAUSES OF ACTION:

COUNT I

36) The plaintiff reasserts the allegations contained in paragraphs 1 through 35 of the Complaint, as if fully set forth herein.

37) The actions of defendant Murphy in refusing to allow the plaintiff the right to elect "surgical castration," at her own expense, while temporarily civilly committed under G.L. Ch. 123A, violated plaintiff's State and Federal Constitutional Rights to "effective assistance of counsel," in that, she was deprived of the right to present a "legitimate avenue of defense" at the trial of her civil commitment proceedings.

### COUNT II

38) The plaintiff reasserts the allegations contained in paragraphs 1 through 35 of the Complaint, as if fully set forth herein.

39) The actions of the defendant's have caused the plaintiff to be subject to a Petition for Trial, which would not have been supportable, absent the lack of "surgical castration," thus depriving the plaintiff of personal financial loss, his liberty and economic potential.

### COUNT III

40) The plaintiff reasserts the allegations contained in paragraphs 1 through 35 of the Complaint, as if fully set forth herein.

41) The actions of defendant Maloney, in instituting a "system wide" policy of arbitrarily and absolutely not allowing persons afflicted with "gender issues" to be treated by a qual-

-11-

ified personnel, who provides services that are of a quality
acceptable when measured by prudent professional standards
within the relevant scientific community, where such treat-
ment has been provided to other inmates/residents suffering
from analogous conditions, without a rational basis and leg-
itimate purpose, constitutes a denial of equal protection under
the State and Federal Constitutions.

## COUNT IV

42) The plaintiff reasserts the allegations contained in
paragraphs 1 through 35 of the Complaint, as if fully set
forth herein.

43) The actions of the defendant's constituted a violation
of plaintiff's substantive due process rights under the State
and Federal Constitution.

## COUNT V

44) The plaintiff reasserts the allegations contained in
paragraphs 1 through 35 of the Complaint, as if fully set
forth herein.

45) The actions of the defendant's constituted a violation
of the Legislature's clear intent under state law. G.L. Ch.-
123A.

## COUNT VI

46) The plaintiff reasserts the allegations contained in
paragraphs 1 through 35 of the Complaint, as if fully set
forth herein.

47) The defendant's have acted in an intentional or reck-

Case 1:03-cv-12643-MEL    Document 6    Filed 12/23/2003    Page 12 of 56

lessly negligent manner causing the plaintiff to be committed
longer than she would have had she been allowed to elect "sur-
gical castration" at her own expense.

COUNT VII

48) The plaintiff reasserts the allegations contained in
paragraphs 1 through 35 of the Complaint, as if fully set
forth herein.

49) The defendant's have acted in an intentional or reck-
lessly negligent manner causing the plaintiff extreme emotional
distress.

WHEREFORE, the plaintiff respectfully request that this
Court grant her the following relief:

(a) a declaratory judgment that the defendant's have a
constitutional and statutory obligation under G.L. Ch.123A to
ensure that all temporary civil commits have access to any and
all treatment deemed "evidence" in their court proceedings, at
their own expense;

(b) a declaratory judgment that defendant Maloney's actions,
as described herein, were arbitrary, without a rational basis
or legitimate purpose, and violated the plaintiff's rights to
equal protection, as a civilly committed resident, under the
State and Federal Constitutions;

(c) a declaratory judgment that the defendant's have a
constitutional and statutory obligation under G.L. Ch.123A to
ensure that all civil commits, including the plaintiff, receive
any and all treatment that would rehabilitate them "as soon as
possible," under the "least restricted conditions necessary to

achieve the purpose of commitment;"

(d) a declaratory judgment that the defendant's acts
have constituted a violation of the Legislature's clear in-
tent in adopting G.L. Ch.123A;

(e) a declaratory judgment that plaintiff's current
civil commitment under G.L. Ch.123A, was premised in part,
on her "gender issues," thereby, constitutionally and statut-
orily obligating defendant's to ensure that plaintiff receives
any and all adequate and necessary medical treatment recommended
by a qualified personnel, who provides services that are of a
quality acceptable when measured by prudent professional stand-
ards within the relevant scientific community;

(f) an injunction requiring the defendant's to ensure that
all temporary civil commits have access to any and all medical
and mental health treatment deemed "evidence" at the trial of
their civil commitment proceedings;

(g) an injunction requiring defendant's to provide plain-
tiff with any and all medical and mental health treatment that
would rehabilitate her as soon as possible, including, but not
limited to "surgical castration(orchiectomy);"

(h) an injunction requiring defendant's to carry out with-
out delay any and all treatment recommendations by any and all
qualified personnel;

(i) an award of damages in the amount of $3,850.00 for
causing plaintiff's personal out-of-pocket financial loss(see
exhibit-5, supra);

(j) an award of damages for causing the plaintiff's lib-

erty and economic opportunities to be curtailed;

(k) an award of damages for causing the plaintiff's extreme emotional distress;

(l) award plaintiff her costs and interest incurred in this action; and

(m) such other and further relief as this Court may deem just and proper.


Dated: 12/16/03 .              Respectfully submitted,

                              Sandy J. Battista, #M-15930
                              Plaintiff/Pro-se
                              Mass. Treatment Center
                              30 Administration Rd.
                              Bridgewater, Mass. 02324



CERTIFICATE OF VERIFICATION

    I, Sandy J. Battista, hereby verify's that all of
the information contained herein is true and accurate
to the best of my personal knowledge, and my records
show them to be true and accurate, except as to those
matters alleged upon information and belief, and as to
those matters, I believe them to be true and accurate.


Dated: 12/16/03 .

                              Sandy J. Battista, #M-15930
                              Plaintiff/Pro-se

Lemuel
Shattuck
HOSPITAL

**EXHIBIT**
1

### Clinic Visit ~ Follow-up Consultation

Date: 8-8-01    Clinic: Surg    Primary Provider: _____

Vital signs: BP 110/70   P 75  RR 18  Temp 96°9  Wt ____  O2-Sat ____

40 yr old w/m c/o bulge Lt Inguinal area
has htx of excersing - had #10 ball dropped on
abd. This is when he feels he "got the hernia"
also pt states he is a Transexual. - would like
to be "castrated" at some time as Hernia repair
PMH - Congenital Hyperplasia of adrenal glands
        (Seen by Endo. at LSH)
PSH  RIH Repair - 1983 -
PE, Thin W/M in NAD -
≠ Abd Exam - Body hair shaved -
        body Tatoo's -   L.I. area - Abd wall
        bulge - Reducceable - (P) LIH ≈ vol -
Vulva. Testes to small -
Imp: LIH asymptomatic + small. + pt
[crossed out] is requesting bilat orchiectomy at
Some Time as hernia repair, we - Recomend
① Surg. repair of LIH be delayed until ② ≤ ③
② pt be seen by psy. ser.          completed
③ pt be seen by Urology ser.
Nurses note: (B 40 y.o. ♂  S/o bulge - LIH
Examined by R. La Rico + discussed ē
Dr. Tsao. (P) Suggest Psych eval
+ Uro. appt            Mary Donato LPN

Page ___ of ___

Consultant's Signature/Print:
Luis Pico MD 8/8/01

Phone/Beeper: _____        Addressograph

RTC: _____

White Copy: Medical Records    Yellow Copy: Requesting Practitioner

OPD.18.08/01

04-59-58                        ACC
BATTISTA, SANDY
12/30/61 M
BRIDGEWATER TRT CTR
508-279-8100   08/01 OP

To: Robert Murphy, Superintendent, MTC

From: Sandy J. Battista, #M-15930

RE: Request To Purchase Female Clothing and Elect Non-Medically
    Necessary Treatment ("Surgical Castration") at my Own Expense.

Dated: 9/10/01.


Dear Superintendent Murphy:

I am writing in regards to request your permission to purchase a
limited amount of "female clothing" 1/ and to elect "Surgical Castration"
at my own expense.

Please note, which I'm quite sure by now your aware from previous
correspondence, I am a diagnosed "Transsexual." Though you may not be
aware, consistent with this diagnosis, as well as guidance, counseling and
treatment from mental health professionals in this field, it is medically
necessary for 'transsexuals' to wear clothing that is typically worn by
females. Prohibiting individuals who legitimately suffer from this dis-
order 2/ from doing so could cause grievous harm to their mental health.
Moreover, a 'blanket' exclusion from any and all recognized treatment to
individuals who legitimately suffer from this disorder, violates established
constitutional and statutory rights because of sex, disability, and gender
identity and expression. See Articles 1 and 14 of the Mass. Dec. of Rights;
Article CXIV of the Mass. Dec. of Rights; as well as "Substantive Liberty
Interest in Appearance and Free Expression as guaranteed by Articles 1 and X
of the Mass. Dec. of Rights. As such, as not to cause any further undue
grievous harm to my mental health, I am requesting that you allow me the
right to purchase at my own expense via a JC Penaney Catalog, a limited
amount of female clothing at my own expense. (See footnote 1/, supra).

Over and aside from the above, as you can see from the attached copy
of a recent consultation with the LSH, on 8/8/01 I was recommended for
"surgical castration," but Dr. Glieberman refused to allow me this non-
medically necessary elected treatment. As such, I am requesting that you
give me permission to elect this procedure at my own expense, either at
the LSH or any other medical facility of your choosing. Please note, that

---

1/ This request is not to be construed as any request to purchase
"dresses" or "skirts." The request is simply for suttle female clothing,
i.e., jeans, dress slacks, blouses, sneakers/shoes, socks, panties &
bras, sleepwear, belts, jackets, all in accord with current property
policy color codes and amounts.

2/ "Transsexualism," better known as "Gender Identity Disorder," is a
recognized disorder within the Mental Health Community, and listed as
a mental disorder in the DSM-IV as requiring such treatment.

—2—

the mental torment I experience 'daily' over my identity issues is
extreme. Having to be forced to live with a growth on my body that
does not belong there is unbearable at times. If this torment gets to
the level where I am left with no other alternative but to castrate my-
self, it will undoubtedly be this facility that will bare the medical
expenses in fixing the damage I inflicted, not to mention any liability
for dis-regarding this request and my established constitutional rights
to be free from discrimination because of sex, disability, gender identity,
and free expression.

In closing, I hope that you will see fit to address this request
appropriately and timely.


Thank you for your consideration and attention in this matter. I
await your reply before proceeding further.


I hereby incorporate by reference my correspondence to you, via copy,
to John D. Noonan, Director of Health Services for the DOC, dated 6/30/01.
(See attached copy hereto for your convenience).


Sincerely,

Sandy J. Battista, #M-15930


cc: S.J.B.(FILE)
    John D. Noonan, DOHS, DOC
    Maryann Percuoco, HSA, MTC
    John F. Cusack, Ph.D., JRI, MTC
    Michael T. Maloney, Comm'r of Corr., DOC

EXHIBIT

3

# CORRECTIONAL MEDICAL SERVICES / UMAS

## "IN HOUSE" CONSULTATION REQUISITION

Institution:

Name: _BATTISTA Sandy Jr_  ID# _M15930_  D.O.B _12-30-6_

Request Date: _9-12-01_

### SPECIALTY AREA (circle)

Dental          Dietary          Optometry          Mental Health          ~~Urgent~~
                                                                           Routine

On Site Clinics:     Orthopedics          Podiatry          Surgical          Other _MHB_

**To Be Completed By Referring Physician**

Reason for Consultation (present illness and history - include summary of current problems(s) MEDS, x-ray, and lab studies, etc.)

_IM ref. by DOC re. letters he wrote to Supt. & Murphy. discussed same w/ R. Casey, Reg. MHD of Prison. Referral being made in order to thoroughly address all aspects of DOC referral._

Referring Physician: _____
(Signature & Stamp)
_MHD_

**To Be Completed By Consulting Physician**

Findings (Problems, Diagnosis) and Recommendations (Therapy, Meds, & Studies)

Mr. Battista's mental status was normal, i.e., he showed no symptoms or signs of a major disorder of mood, thought, or impulse control. Other than repeating his request to have his testes removed, he asked for no psychiatric assistance or service.

~~Since Mr. Battista has been in the SOTP for over a decade and has been~~ followed by MH counselors for years, those professionals may be able to comment on the nature of Mr. Battista's request. I do not know him and cannot make any "interpretations". My concern is that Mr. B. is in custody and not a "free man" to make "free choices" in regard to an irreversible mutilation. If his demand is viewed as a legitimate request for ~~an inmate in a Mass Correctional Institution,~~ he should be counseled by an expert in the emotional and physical consequences of the procedure and its outcome by somebody outside MTC, i.e., an independent expert.

Consulting Physician: M Bauermeister, M.D.
(Print Name)

Date: _9/18/01_

Final Diagnosis: _Request for Castration_

CMS 8031 Rev. 4/95

EXHIBIT

4

September 19, 2001

Sandy-Jo Batista, M-15930
D2 - 3
Massachusetts Treatment Center

Dear Mr. Batista:

I have reviewed your recent correspondence requesting to receive certain articles of clothing and a complaint concerning the denial of an elective surgical procedure.

Be advised clothing is regulated by Department Policy 403, Clothing.  Your request is not allowable pursuant to this policy and therefore denied.

The review and determination of your request for an elective surgical procedure appears to have been handled appropriately and in accordance to Department Policy and Practice. Therefore, no further action is warranted.

Sincerely,

Robert Murphy
Superintendent

RM/bm
cc:    C. Mitchell, Deputy Superintendent of Treatment/Classification
       J. Noonan, Director, DOC Health Services Division
       M. Percuoco, Health Services Administrator
       D. McLaughlin, Director of Mental Health
       File

# DIANE ELLABORN, LICSW

152 Edmands Road
Framingham, MA 01701

Phone 508-788-5406
Fax   508-788-7761

**EXHIBIT**

tabbies

**5**

(Pg. 1 of 2)

## FEE FOR SERVICE STATEMENT

## ACCOUNTING FOR RETAINER  AUGUST / SEPTEMBER / OCTOBER

Bill to:
Sandy J. Battista
Mass Treatment Center
30 Administration Road
Bridgewater, MA 02324

Client's Name:
Sandy J. Battista
#M-15930

| Date | # of hours | Services Rendered | | |
|------|-----------|-------------------|---|---|
| August/ September | 2 hours | Collateral Contacts & Review of Records received from client and Attorney | | $220.00 |
| 9-24-01 | 4 hours | Record review and travel | | $440.00 |
| 9-28-01 | 8 hours | Record review and travel | | $880.00 |
| September | 2 hours | Internet research | | $220.00 |
| October | 1 hour | Consult with lawyer and Endocrinologist on case | | $110.00 |
| | | 17 hours —Fee $110.00 per hour | Total | $1870.00 |
| | | Retainer | | $2200.00 |
| | | Balance left | | $ 330.00 |

Provider:
Diane Ellaborn, LICSW
152 Edmands Road
Framingham, MA 01701

*Diane Ellab*

Diane Ellaborn, LICSW

# DIANE ELLABORN, LICSW

152 Edmands Road
Framingham, MA 01701

Phone 508-788-5406
Fax   508-788-7761

## FEE FOR SERVICE STATEMENT

Bill to:    Sandy J. Battista
            Mass Treatment Center
            30 Administration Road
            Bridgewater, MA 02324

Client's Name:    Sandy Battista
                  #M-15930

Estimated Time          Services Rendered

| Date | Estimated Time | Services Rendered |
|---|---|---|
| 10-7-01 | 6 hours | Meeting with client and travel |
| October | 4 hours | Court preparation and report |
| 10-25-01 | 8 hours | Full Day in Court |

18 hours          Total Due          $1980.00

Credit from last Retainer          330.00

$1650.00 Due

*Please note any retainer not used will be returned to client.
Excess time will be billed to client

Provider:    Diane Ellaborn, LICSW
             152 Edmands Road
             Framingham, MA 01701

             Diane Ellaborn, LICSW

# DIANE ELLABORN, LICSW

| | |
|---|---|
| 152 Edmands Road | Phone 508-788-5406 |
| Framingham, MA 01701 | Fax   508-788-7761 |

### Gender Evaluation

October 17, 2001

Re:   Sandy J. Battista aka David Megarry

Attorney Christopher P. LoConto has requested this gender specialist evaluate whether Sandy Jo Battista has a Gender Identity Disorder, if he does, to clarify the nature and treatment of this condition and the possible implications for him if he undergoes treatment.

By way of introduction, I am a licensed clinical social worker in full time private practice. I have practiced for 22 years after obtaining my Masters in Social Work degree. I am a NASW Diplomate in Clinical Social Work. I have completed specialized training to become a Gender Specialist and primarily evaluate and treat patients with gender conditions. I am a member of the Harry Benjamin International Gender Dysphoria Association as well as an appointed member to the association's Ethics Committee. I am an elected board member and clinical consultant to the International Foundation of Gender Education. I have lectured internationally on the subject of gender conditions and trained professionals about the evaluation and treatment of gender dysphoria. I follow the Harry Benjamin International Gender Dysphoria Association's Standards of Care for the diagnosis and treatment of persons with gender dysphoria.

This association outlines the task of a Gender Specialists as:

> Mental health professionals (MHP) who work with individuals with gender
> identity disorders may be regularly called upon to carry out many
> of these responsibilities:

1. to accurately  diagnose the individual's gender disorder;
2. to accurately diagnose any co-morbid psychiatric conditions and see to their appropriate treatment;
3. to counsel the individual about the range of treatment options and their implications;
4. to engage in psychotherapy;
5. to ascertain eligibility and readiness for hormone and surgical therapy;
6. to make formal recommendations to medical and surgical colleagues;

7.    to document their patient's relevant history in a letter of
      recommendation;
8.    to be a colleague on a team of professionals with interest
      in the gender identity disorders;
9.    to educate family members, employers, and institutions
      about gender identity disorders;
10.   to be available for follow-up of previously seen gender patients.

During this evaluation I have reviewed Sandy Jo Battista's record for 12 hours, interviewed and evaluated Sandy Jo Battista in person for 4 hours and administered two diagnostic tests, interviewed on telephone, Deborah Johnson, Sandy Jo Battista's sister, contacted by telephone his endocrinologist Dr. Maria Warth and consulted with a pediatric endocrinologist about the medical/genetic condition he was born with: Congenital Adrenal 12 Hyperplasia which is considered an intersex condition.

The following is an overview of psychosocial history. I will not outline this history in detail since it is well documented in the record and by previous evaluations. I will, however, focus on Sandy Jo Battista's gender history, which is pertinent to this evaluation.

Sandy Jo Battista was born the middle of three children. He was born with a genetic disorder Congenital Adrenal 12 Hyperplasia , which results in an increased secretion from the adrenal gland of cortisol steroids and androgens. It is reported that Sandy's mother was rejecting toward him due to this condition and therefore his maternal grandmother cared for him as a baby. The home environment was described as physically violent which eventually culminated in the accidental death of his mother. It is unclear how old Sandy was at the time of this event but estimated between the age of 4-8. Abusive punishment was also described in this home environment. After the death of Sandy's mother, his father was incarcerated for involuntary manslaughter and Sandy was placed in care with his maternal grandparents who were allegedly physically and possible sexually abusive and neglectful. His placement was subsequently changed to his paternal grandparents. His father was also in this environment after he was released from prison. The record suggests this environment may also have been physically abusive. Sandy's father relinquished his custody and he was placed in a series of foster homes. Sandy has a history of breaking and entering charges and molestation of females.

He was placed at age 15 in a DYS secure facility. Previous placements include Metropolitan State Hospital and Medfield State Hospital. He is currently at Bridgewater Treatment Center. He has completed a twelve to twenty year sentence for rape of a child on May 29, 2001. Sandy Jo Battista is awaiting a probably cause hearing to determine whether he currently meets the criteria for a sexually dangerous person.

Sandy Jo Battista has a long history of cross gender identification and expression dating back to early latency ages 5-7 years old. Crossdressing is reported in his sister's

clothing, sleeping in her pajamas, wearing his sister's underwear under male clothing. No sexual arousal is reported in these early crossdressing experiences. It also is reported that Sandy Jo exhibited crossgender play as evidenced by playing with his sister's dolls and toys. He preferred playing with his sister or alone rather than with his same sex sibling or peers.

It is apparent from Sandy's history that this persistent gender condition continued to be expressed throughout his incarceration and has been longstanding. Examples of adult crossgender identification include:  history of name change to a female name (1995), crossdressing throughout his incarceration in female underpants (until this practice was disallowed), wearing of neutral or androgynous women's outer garments, use of pens and art pastels as eye makeup, attempts to harm testicles through tying testicles with rubber bands, freezing testicles with cups of ice and sticking sewing needles in testicles. It also is reported that he once offered a roommate money if he cut off his testicles (this did not occur). Sandy also reported a long history of the use of female hygiene products, shaving legs, chest, arms and underarms, plucking eyebrows and sitting while urinating. As mentioned I also administered two diagnostic tests to verify Sandy's diagnosis. Although there is no definitive psychological or medical test to verify Gender Identity Disorder, there are two tests that this evaluator uses as part of a gender evaluation. The results of the first test  "A Cross-Gender Questionnaire" by Richard E. Docter, Ph.D. and James S. Fleming, Ph.D., reflects a transsexual rather than transvestite identity and no arousal linked with this identity.  The second test "The Cogiati" by Jennifer Reitz, results reflect Sandy falls into the category of four, "probable transsexual" described as "your score places you among the majority of those diagnosed transsexuals, the "late onset" transsexual."

This early history of childhood crossdressing without sexual arousal, crossgender play and crossgender preference, along with adult evidence of gender condition, coupled with body dysphoria is evidence that Sandy Jo Battista meets the criteria for Gender Identity Disorder formerly called Transsexualism. The criteria for this diagnosis includes:

A.    A strong and persistent cross-gender, identification (not merely a desire for any perceived cultural advantages of being the other sex).

In children, the disturbance is manifested by four (or more) of the following:

(1)    repeatedly stated desire to be, or insistence that he or she is, the other sex
(2)    in boys, preference for crossdressing or simulating female attire, in girls, insistence on wearing only stereotypical masculine clothing
(3)    strong and persistent preferences for cross-sex roles in make-believe play or persistent fantasies of being the other sex

(4)     intense desire to participate in the stereotypical games
        and pastimes of the other sex
(5)     strong preference for playmates of the other sex

In adolescents and adults, the disturbance is manifested by symptoms
such as a stated desire to be the other sex, frequent passing as the
other sex, desire to live or be treated as the other sex, or the conviction
that he or she has the typical feelings and reactions of the other sex.

Persistent discomfort with his or her sex or sense of inappropriateness
In the gender role of that sex.

In children, the disturbance is manifested by any of the following: in
boys, assertion that his penis or testes are disgusting or will disappear
or assertion that it would be better not to have a penis, or aversion
toward rough-and-tumble play and rejection of make stereotypical
toys, games, and activities; in girls, rejection of urinating in a sitting
position, assertion that she has or will grow a penis, or assertion
that she does not want to grow breasts or menstruate, or marked
aversion toward normative female clothing.

In adolescents and adults, the disturbance is manifested by symptoms
such as preoccupation with getting rid of primary and secondary sex
characteristics (e.g. request for hormones, surgery, or other procedures
to physically alter sexual characteristics to simulate the other sex) or
belief that he or she was born the wrong sex.

The disturbance is not concurrent with a physical intersex condition.

The disturbance causes clinically significant distress or impairment
In social, occupational, or other important areas of functioning.


Sandy Jo Battista is more accurately diagnosed with Gender Identity Disorder Not
Otherwise Specified  (NOS) codified in DSM IV as 302.6. This reflects he meets the
criteria for Gender Identity Disorder and also has an intersex condition as noted in DSM
IV, Congenital Adrenal 12 Hyperplasia and accompanying gender dysphoria.

It is my professional opinion that Sandy Jo Battista meets the criteria for Gender Identity
Disorder NOS. In terms of differential diagnosis he does not meet criteria for
Transvestic Fetishism since historically and currently there is no sexual arousal linked
with his crossgender identification or expression and there is significant body dysphoria
along with the expressed desire to take progressive steps to become fully female. He
also does not meet criteria for malingering since crossgender identification and behavior
date back to early childhood and did not begin during incarceration.

Gender Identity is the internal understanding and psychological expression of being male or female. In most people this internal sense of self and outward expression match ones anatomy. When a person has a gender identity disorder they are opposite. Gender identity and sexual identity including sexual attraction, orientation, arousal and/or expression are separate identities. In Sandy Jo Battista's case her history of sexual offending appears to have nothing to do with her gender identity. People with gender identity disorder do not generally have deviant sexual arousal and/or expression and if they do it is rarely linked to their gender identity. In this case there is no sexual arousal linked to Sandy Jo Battista's gender identity and expression.

Gender Identity Disorder NOS is a recognized disorder codified in DSM IV as 302.6 with well recognized treatment involving psychotherapy, endocrinology and surgery. There is increasing persuasive evidence that this is a medical condition and is biological as reflected in recent brain research. Furthermore, Sandy has an intersex condition that can exacerbate gender dysphoria.

Sandy was diagnosed after birth with Congenital Adrenal Hyperplasia. According to reports there is a 21-hydroxylase deficiency. Normally the H-Y antigen is present on the cell surface of males and absent in females. In a research study by Eicher. et. al. (1979), they found a H-Y antigen deficiency in male to female transsexuals they studied. This implies there is a biological origin to Sandy's internal sense of being female that relates to his genetic intersex condition.

As noted, adult treatment of Gender Identity Disorder NOS includes psychotherapy, endocrinology and surgery. As mentioned previously The Harry Benjamin International Gender Dysphoria Association has established Standards of Care for this treatment. It is highly recommended that Sandy Jo Battista be treated psychologically by a gender specialist. He requested this treatment in 1996. Without this treatment it is this professional's opinion that she would be at high risk for depression, anxiety, suicide and self-abuse.

Also in 1996 he requested approval for crossgender hormone therapy administered by an endocrinologist. The recommended treatment is estrogen therapy and antiandrogen therapy to suppress testosterone and begin the feminization process. The secondary benefit of this treatment relevant to Sandy Jo Battista's case is that this treatment suppresses male sex drive, suppresses arousal, lowers aggressiveness and atrophies the genital area so it becomes first difficult then eventually impossible to attain and/or maintain an erection of his penis.

Sandy Jo Battista has also recently requested approval for surgery, notably elective castration (orchiectomy). This surgery is part of the sex reassignment process. In regards to his specific case the secondary benefit will be that his testosterone production will be dramatically lowered to 80% thus lowering aggression, sex drive, sexual arousal and eliminating the ability to attain and/or maintain an erection of his penis. In the motion recently filed to request elective castration it is noted that "empirical studies on the effects of castration of the sex offender, whether chemical or surgical,

have proven reasonably effective in suppressing re-offending sexual behavior including deviant sexual behaviors." These two treatments both crossgender hormone treatment and surgery are highly recommended as medical treatment for his Gender Identify Disorder.

In conclusion, Sandy Jo Battista clearly meets the criteria for Gender Identity Disorder, NOS. This condition is considered both psychological and medical in nature. This condition also appears related to his intersex condition Congenital Adrenal 12 Hyperplasia. While incarcerated he has been treated medically for his intersex condition and likewise should be allowed treatment psychologically and medically for his gender condition. The benefit of such treatment is two-fold, it will help resolve Sandy Jo Battista's persistent gender dysphoria and lower his risk of reoffending.

Diane Ellaborn, LICSW
NASW Diplomate in Clinical Social Work

# DIANE ELLABORN, LICSW

NASW Diplomate in Clinical Social Work          152 Edmands Road ✕ Framingham, MA 01701 ✕ (508) 788-5406

| | |
|---|---|
| **PRIVATE PRACTICE** | **PRIVATE PSYCHOTHERAPY PRACTICE** |
| | • Individual, couple and family therapy |
| | • Specialty in the evaluation and treatment of adults and youths with gender issues and their families |
| 1985 to Present | • Conduct therapy groups for transgendered individuals |
| | • Divorce and family mediation |

**CONSULTATION SERVICES**
- Supervise and train therapists about gender issues
- Consult on cases involving transgendered clients
- Conduct in-service training in conflict resolution skills for couples, schools and human services programs

## EMPLOYMENT

**1994 to 1996**

**BRANDON START**, Natick, MA
Hospital diversion program for boys (7 - 17)
Title: Clinician (part-time)
- Provided short-term, intensive individual and family counseling
- Performed diagnostic assessments
- Evaluated and treated gender-varient residents, including cross-dressing and transsexual adolescents
- Case management

**1989 to 1994**

**ADOPTIONS WITH LOVE, INC.**, Newton, MA
Title: Clinical Social Worker
- Provided grief counseling to birthmothers contemplating an adoption plan
- Coordinated housing program for birthmothers and led a support and therapeutic group for in-state birthmothers
- Acted as liaison with prospective adoptive couples, their social workers, attorneys and outside social service agencies
- Coordinated the agency's continuing education and in-service program
- Coordinated prenatal and postnatal care with maternity staff
- Performed surrenders and facilitated meetings between birthparents and adoptive couples

**1985 to 1989**

**BEAVERBROOK GUIDANCE CLINIC**, Waltham, MA
Title: Coordinator of Day Services
- Coordinator of Adolescent Day Activities Program (see below)
- Developed and coordinated new day services
- Member of Executive Director's Advisory Board

(Continued on next page)

**Title: Coordinator of Adolescent Day Activities Program**
Hospital diversion program for disturbed adolescents who are at-risk
or have been psychiatrically hospitalized
- Administer therapeutic after-school program in Met Beaverbrook
  Area, including proposal writing, budget planning, and staff
  supervision
- Conduct therapy groups in Belmont High School for Focus and
  Resource Programs; and consult with teachers
- Conduct therapy group for dual-diagnosis (MR/ED) students in
  community setting and therapy groups in temporary adolescent shelter
- Provide individual/family counseling and case management
  for ADAP clients

**Title: Adolescent Case Manager**
- Perform major casework for 15-20 adolescents and young adults
  (ages 12-22) who have been hospitalized in psychiatric facilities or
  are at risk of psychiatric hospitalization
- Provide individual and family therapy and/or referral to outside
  practitioners
- Act as liaison to school, court system, Dept. of Social Services
  and other community service agencies
- Assess adolescents and refer to appropriate DMH services,
  including day treatment, residential programs and after-school groups
- Crisis intervention for regular caseload and on a rotating basis for
  clinic patients at large

1981 to 1985      **ROBERT F. KENNEDY ACTION CORPS,** Lancaster, MA
                  **Title: Family Social Worker**
- Major case and family work for 16 adolescent boys (ages 12-18)
- Performed short-term diagnostic family assessments
- Group leader for adolescent boys' therapy group
- Supervised and trained MSW candidates and group counselors
- Individual and family counseling
- Developed treatment and discharge plans
- Acted as liaison to schools, court system, and community agencies

1979 to 1980      **CATHOLIC HOME BUREAU,** New York, NY
                  **Title: Senior Case Worker**
- Major casework responsibility for inner-city, minority, adolescent
  girls (ages 12-21) in residential group home setting
- Individual, group and family counseling
- Supervised and trained child care staff

**COMMUNITY**     **CHILDREN'S HEARINGS PROJECT,** Cambridge, MA
**VOLUNTEER**     **Title: Community Mediator, since 1981**
**WORK**          Mediate family/child disputes
                  Work with program staff to train new mediators
                  Member of Advisory Council

**EDUCATION**
School of Social Welfare
State University of Stony Brook, Stony Brook, NY
Degree: MSW 1979

State University College at Old Westbury, NY
Degree: BS in Women's Studies 1976

International Foundation for Gender Education, Waltham, MA
Special training to work with individuals with gender issues (1990)

**CERTIFICATION**
NASW Diplomate in Clinical Social Work   (1992)
NASW Register of Clinical Social Workers (1990)
LICSW (Massachusetts: 1983)
CSW    (New York: 1980)

**ASSOCIATIONS**
Clinical Consultant, International Foundation
for Gender Education (1997)

Harry Benjamin International Gender Dysphoria Association, Member

National Association of Social Workers, Member

**PUBLICATIONS**
"The Age of Manhood: The FtM Development in
Adolescence." Chapter in yet untitled anthology by
Dean Kotula.

Know Your Legal Rights as an Adult Home Resident
North Shore Unitarian Veatch Foundation: New York 1980

**REFERENCES**
Furnished upon request

EXHIBIT

6

(Pg. 1 of 2)

To: Robert Murphy, Superintendent, MTC

From: Sandy J. Battista, #M-15930

RE: "Request for Reconsideration to 'Elect Surgical Castration/Hormone (Estrogen) Replacement Therapy' at own expense, pursuant to 103 DOC 604.04."

Dated: 10/30/01.

COPY

Dear Superintendent Murphy:

I am writing in regards to a previous request upon you to be allowed to "elect 'Surgical Castration/Hormone(Estrogen) Replacement Therapy'" at my own expense, which you denied in a memorandum dated September 19, 2001.

In your memorandum, you state as reasons for your decision, that... "the review and determination of your request for an elective surgical procedure appears to have been handled appropriately and in accordance with Department Policy and Practice."

Please note that, per policy, ..."elective surgery shall be provided to inmates in order to correct a functional deficit or if an existing path- ological process threatens an inmate's well being over a period of time." See 103 DOC 604.04("Routine Hospital Admissions/Outpatient Consultations").

With the above said, it is noted that it appears that my previous re- quest was not handled appropriately nor in accordance to DOC policy and practice, as outlined in 103 DOC 604.04. Id. The report of Diane Ellaborn, LICSW, attached hereto clearly suggests that it is in my "long-term interest to have these elective medical procedures immediately." It is also important to note here that the attached report of Diane Ellaborn, LICSW, was done in accordance with "The Harry Benjamin International Gender Dysphoria Association's Standard of Care" for Gender Identity Disorders. (See attached also). These standard's of care acknolwegde these medical procedures, amongst other, as being "medically necessary" for the diagnosis and treatment of persons with gender dysphoria. Without this treatment, as opined by Diane Ellaborn, LICSW, there is a significant risk I will suffer extreme depression, anxiety, suicide and self-abuse. Diane Ellaborn is an expert and highly qualified in the diag- nosis and treatment of gender identity disorders, as evident by the attached report/resume.

In closing, I am requesting reconsideration of my right to "elective surgical procedures," per policy, 103 DOC 604.04, in liue of the attached expert medical opinion. As such, please process the enclosed request, in accordance with relevant policy and practice. Id.

Thank you for your attention and consideration in this matter. I await your reply before proceeding further in this matter.

Sincerely,

Sandy J. Battista, #M-15930

-2-

cc: S.J.B.(FILE)
    Christopher P. LoConto, Esq.
    Christopher Mitchell, Deputy Superintendent of Treatment/Classification
    John D. Noonan, Director, DOC Health Services Division
    Maryanne Percuoco, Health Services Administrator
    Diane McLaughlin, Director of Mental Health

EXHIBIT

8

November 27, 2001

Sandy-Jo Batista, M-15930
D2 - 3
Massachusetts Treatment Center

Dear Mr. Batista:

This letter is a response to your October 30, 2001 letter to me. In your letter you request reconsideration of a medical matter claiming I had denied your request in a previous letter to you. You may recall my letter stated the matter had been handled appropriately. You have requested a medical procedure and medical decisions are the sole province of the health care authority.

As a medical matter, your request was handled as required by applicable Department policy. No further action is warranted at this time.

Sincerely,

Robert Murphy
Superintendent

RM/bm
cc:    M. Murray, DOC Legal Counsel
       File

EXHIBIT

9

(Pg. 1 of 7)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                )
SANDY J. BATTISTA,              )
                                )
        Plaintiff,              )
                                )
            v.                  )      02-CV-10137-MEL
                                )
ROBERT MURPHY, MICHAEL T.       )
MALONEY, JOHN NOON, STEPHEN     )
GLAVIN, JOSEPH MURPHY,          )
CHRISTOPHER MITCHELL,           )
BARBARA SCHWARTZ, and MARK      )
SPERRE,                         )
                                )
        Defendants.             )
                                )
```

MEMORANDUM AND ORDER

LASKER, D.J.

Sandy J. Battista began serving a 12-20 year sentence

for rape of a child under 16 and concurrent sentences for armed

robbery and kidnapping in February 1983. After Battista

completed her sentence, a justice of the Worcester Superior Court

found that there was probable cause to believe that Battista was

a sexually dangerous person, and she[1] has resided at the

Massachusetts Treatment Center pending a hearing on her

commitment as a sexually dangerous person, pursuant to M.G.L. ch.

---

[1]To avoid confusion, the Court will refer to Battista using
feminine pronouns.

1



123, § 13 to this day. Battista, acting pro se, brings this civil rights action against the Massachusetts Department of Corrections (DOC) and treatment providers employed by the DOC. Battista alleges that she suffers from gender identity disorder (GID), and she claims that the defendants have failed to provide for her care, custody, safety and rehabilitation as a transsexual in the form of hormone therapy, sex reassignment surgery and specialized psychotherapy in violation of the First, Eighth and Fourteenth Amendments.

Battista seeks declaratory and injunctive relief and damages. Specifically, she asks the court to order the defendants to provide her with hormone therapy, psychotherapy, a compatible roommate, and sex reassignment surgery. Battista brought a similar cause of action against the Commonwealth of Massachusetts asserting similar claims concerning her GID. In June 1998, the Suffolk Superior Court held that the defendants had not exhibited deliberate indifference in refusing to provide Battista with the same type of GID treatment as she now requests. The Suffolk Superior Court explained:

> The Court has considered whether Battista
> suffers from transsexualism and whether
> transsexualism presents a 'serious medical
> need.' In this consideration, the Court has
> found that it is Battista who has diagnosed
> herself as a transexual . . . the record is
> replete with uncontested evidence of the

2

> attempts of the prison medical staff to
> evaluate Battista's psychological problems
> and her refusal to cooperate.

<u>Battista v. Commonwealth of Massachusetts, et al.</u>, No. 97-03487
(Suffolk Superior Court) (1998).

Both the DOC defendants and the named treatment
providers move to dismiss Battista's complaint.  The motion is
GRANTED.

I.

Defendants assert that Battista's instant complaint is
barred under the doctrines of res judicata and collateral
estoppel.  Res judicata, defendants stress, aims to prevent
parties from relitigating issues which were or could have been
raised in a prior action after a court has entered a final
judgment on the merits in the prior action.  <u>See</u> <u>FDIC v.
Shearson-American Express, Inc.</u>, 996 F.2d 493, 497 (1st Cir.
1993).

The defendants contend that this case meets the three
prerequisites that trigger res judicata: (1) identity or privity
of the parties to the present and prior actions; (2) identity
the cause of action; and (3) prior final judgment on the merits.
<u>See</u> <u>Glouster Marine Railways Corp. v. Parsi, Inc.</u>, 36 Mass. App.
Ct. 386, 391 (1994).  First, defendants assert that in both cases
the parties have been substantially identical -- both name DOC

3

officials.  Second, the issues in both cases concern Battista's
custody and care and treatment of her GID.  Third and finally,
the final judgment entered in the prior case in the 1998 Suffolk
Superior Court decision, granted the DOC defendants' motion for
summary judgment on all the causes of action raised by Battista.
Accordingly, defendants conclude that Battista is barred from
relitigating issues adjudicated in the state court decision.

The three elements required to trigger application of
the res judicata doctrine are present in this case.  First, the
state court has entered a final judgment on the merits.  Second,
there is an identity of the parties named in the state court
action and the defendants named in this action.  Third, there is
an identity of the causes of action.  As in the instant case, in
state court Battista alleged that she was a transsexual and
raised numerous claims regarding her custody, care, and her GID
treatment.  Accordingly, the final judgment entered in the state
court "bars further litigation on all matters that were or should
have been adjudicated in the action."  Heacock v. Heacock, 402
Mass. 21, 23 (1988).

## II.

Alternatively, defendants move to dismiss under the
ripeness doctrine.  Defendants contend that even assuming

4

arguendo that Battista's involuntary civil commitment might
entitle her to greater due process protections under the
Fourteenth Amendment, the complaint should be dismissed as
premature.  Currently, Battista's commitment is temporary,
pending a trial on the D.A.'s petition to civilly commit her for
the term of one day to life, and the defendants assert that " the
issues of [her] constitutional right to a compatible cell-mate or
to treatment for [her] GID as an individual under civil
commitment is not yet ripe for adjudication."

It is unnecessary to decide the ripeness issue, because
the complaint is dismissed pursuant to the res judicata doctrine.
However, even if Battista's complaint were not barred by res
judicata, adjudicating Battista's injunctive and declaratory
claims, prior to a definite order to civilly commit her would be
premature.  It is possible, of course, that Battista will be
released from DOC custody and would then be free to obtain the
treatments for her GID that she desires.

### III.

Represented by separate counsel, defendants Barbara
Schwartz and Mark Sperre, move to dismiss the complaint for the
reasons stated above, and further, because the complaint does not
allege any facts that support a finding that Schwartz or Sperre

5

violated Battista's constitutional rights.  Sperre and Schwartz
are employees of the Justice Resource Institute, a prior contract
provider for the Massachusetts DOC for sexual offender treatment
programs at the Massachusetts Treatment Center (MTC).

Battista's complaint alleges that Battista wrote
Schwartz a letter requesting treatment for GID, and that Schwartz
sent a copy of the letter to Sperre.  Battista alleges further
that the defendants denied her request for treatment, and she
notes that Schwartz wrote "JRI is contracted to provide sex
offender treatment only."  Schwartz and Sperre stress that they
are not custodians and therefore cannot be liable under the
Eighth Amendment.  They argue that they are "clearly peripheral
to the central allegations of the complaint."  Finally, the
defendants underscore that their employer, JRI, is no longer
contracting with the DOC to provide sexual offender treatment
services and that even if there were some prospective relief
available to Battista they would not provide the service.

The motion to dismiss is **GRANTED** as to Sperre and
Schwartz, because the complaint alleges no facts as to Sperre's
conduct, and as to Schwartz it merely documents her response
letter to Battista's request for gender identity disorder
treatment.  JRI, a non-profit organization, contracted with the
DOC to provide sexual offender treatment, not GID treatment, to

6

patients at the MTC.

## IV.

For the reasons stated above, the motions to dismiss are GRANTED.  The complaint is dismissed.

It is so ordered.

Dated:      November 4, 2002              _Leonard E. Casey_
            Boston, Massachusetts         United States District Judge

7



**Commonwealth of Massachusetts**
**County of Worcester**
**The Superior Court**

CIVIL DOCKET# **WOCV2001-01108**

Commonwealth of Massachusetts
    Plaintiff(s)

vs.

Sandy Jo Battista,
    Respondent(s)

## JUDGMENT ON JURY VERDICT

This action came on for trial before the Court and a jury, Constance Sweeney, Justice, presiding, the issues having been duly tried and the jury having rendered its verdict, finding that the defendant, Sandy Jo Battista, is a sexually dangerous person said Sandy Jo Battista is hereby committed to the treatment center for an indeterminate period of a minimum of one day and a maximum of the respondent's natural life until discharged pursuant to the provisions of section 9.

Dated at Worcester, Massachusetts this 15th day of May, 2003.

Francis A. Ford,
Clerk of the Courts

BY: _____
                              Assistant Clerk

Copies mailed 05/15/2003

cvdjudverp_1.wpd 945627 verdict brennanc

EXHIBIT

11

(Pg. 1 of 15)

**Forensic Health Services, Inc.**
**214 Lincoln Street, Suite 208**
**Boston, MA – 02134**
**(617) 782-5144**

## REPORT OF QUALIFIED EXAMINER TO THE COURT

Presiding Justice
Worcester Superior Court
Court House
2 Main Street
Worcester, MA 01608

Date of Report: 4/1/2002
RE: Sandy Jo Battista FKA David Megarry
DOB: 12/30/61

### Identifying Data:

Sandy Jo Battista is a 40-year-old, never married, Caucasian male who was committed to
the Massachusetts Treatment Center (MTC) May 24, 2001 to await a probable cause
hearing regarding his sexual dangerousness. Probable cause was found 12/14/01 and Mr.
Battista was returned to the MTC for this 60-day evaluation period. A 60-day stay was
granted ending 3/1/02 allowing qualified examiners to interview him. A court order
required the interview be tape-recorded. On January 27, 1983, Mr. Battista was sentenced
out of Worcester Court to serve a 12-20 year sentence for one count of rape, and 9-10
year sentences for kidnapping and robbery, all to run concurrently. Upon his release he
will return directly to the community with no probation.

### Warning Of Limits of Confidentiality:

I met with Mr. Battista on 3/1/02 in order to interview him for this evaluation. I informed
him I am a licensed psychologist and that I was ordered by the Court to gather information
that the Court could use to determine his status as a Sexually Dangerous Person (SDP). I
informed him that he was not required to answer any individual question or participate in
the interview, but that I would be sending a report to the Court regardless of his
participation. I informed him that this interview was not confidential, as any aspect of our
interview might become a part of the court proceeding through a report or oral testimony.

After providing him with the limits of confidentiality, Mr. Battista agreed to speak to me. I

I asked him to tell me, in his own words, his understanding of the limits of confidentiality. I asked him if he had spoken to his attorney regarding this matter. He stated he had recently dismissed his attorney, Mr. LoConte. He had not discussed his case in depth with this new attorney, Mr. Paul Machado, Esq. Mr. Battista reiterated his willingness to participate in any case. In my opinion, Mr. Battista demonstrated an adequate understanding of the limits of confidentiality.

I interviewed Mr. Battista for 20 minutes on the housing unit. The rest of the interview was conducted in the Health Services Unit.

### Sources Of Information:

I met with Mr. Battista on 3/1/02 at the MTC for approximately two hours.

The clinical and administrative records available at the MTC were reviewed.
I reviewed:
- His family, developmental and treatment history with him;
- The police reports, witness statements and Mr. Battista's statements regarding the governing offense as well as other sexual incidents occurring 3/77 and at least twice prior to 3/77,
- Mr. Battista's Criminal Offense Record (CORI) compiled by the Criminal History Records Board;
- His DOC six part file which includes disciplinary reports, classification forms and parole records,
-evaluations from Worcester State Hospital, adolescent unit (7/29/77, Medfield State Hospital (MSH) adolescent program summary reports (7/4/79) MSH adolescent program notes (1978- 1979),
- and Justice Resource Institute (JRI) notes, and an intake and assessment report date 11/18/98 completed by David Campopiano, MA, supervised by Robert Prentky, Ph.D.
-Sexually Dangerous Person evaluations conducted in 3/84,
-a psychological assessment conducted by J. Tyler Carpenter, Ph.D. consulting psychologist at MCI-Norfolk,
-Bridgewater State Hospital evaluations from January 1983.

Mr. Battista provided this writer with several documents for my review for the purpose of this evaluation. These included:

-A gender evaluation conducted by Diane Ellaborn at Mr. Battista's expense;
-His CORI;
-An evaluation of his sexual dangerousness completed by Carol Feldman, Ph.D., J.D. requested by the Worcester District Attorney's office for a Probable Cause hearing;
-An evaluation of his sexual dangerousness completed by Ron Ebert, Ph.D., requested by Mr. Battista and his defense attorney;
-A relapse prevention plan completed by Mr. Battista and signed by his therapist David

Cerce,
-Two articles from a newspaper regarding his request for castration, one an editorial column.

## Family History:

Mr. Battista is a 40-year-old, never married, Caucasian male. He is the second of three children. He also has a younger half brother. Records are inconsistent regarding his age at the time of his mother's death. His father reportedly beat his mother to death after finding her in bed with someone else and served a state prison sentence for manslaughter as a result. Mr. Battista was reportedly between six and eight years old. Some records indicate he witnessed her death, but he states he has no recollection of it. The marital relationship was reportedly conflictual and characterized by physical abuse. Mr. Battista's father was alcoholic and was known to shoot off a gun in the house to gain the attention of the household. Police were called to the house as a result of this behavior at least once. His father passed away last year. His father worked in maintenance for the city of Worcester

Mr. Battista reported regular and close contact with his older sister to this evaluator. He also indicated he would be able to reside with her in Ohio. She is divorced with four children. However, DOC records indicate that he had no contact with his family and that they disowned him as a result of the crime. During the interview he indicated his brother also resided in Ohio and that he was in regular contact with him as well. He reports he has a half brother that he has no contact with. He stated he was the only child with a significant criminal history, his brother has had drug charges.

After his father was incarcerated for the death of his mother, he and his two siblings were sent to live with his maternal grandparents. Within a year the children were removed from this placement due to charges of neglect and abuse. The children were living in the basement, sleeping on a pull out couch and without adequate food. The records also state the children were exposed to pornographic material and sexual acting out on the part of the maternal grandmother and her friends. Mr. Battista stated he did not recall being sexually abused and that he preferred to remember his family members in a positive light by not speaking poorly of them. He also minimized his treatment at his grandparents home stating that they were not abusive. Other evaluators and records indicate the children were locked in a bathroom and firecrackers were thrown in on them.

He and his siblings were next sent to live with his paternal grandmother. He reports she was good to him. Records are consistent on this point. Records indicate she sought assistance through the court to handle him as a stubborn child. He remained with her until his father's release at which time he was returned to his father's care. His father sought placement for him through the courts after three months. Records indicate he was sent to several foster homes and other placements. During our interview he recalled remaining in one placement and reported positive memories of the family and time he spent there.

In 1977, he was sent to a Department of Youth Services program on the Medfield State Hospital grounds. He was adjudicated delinquent at age 16 and remained there until age 18. He reported the program had petitioned the court for him to remain there and there is documentation to that effect. Other documentation indicates the program was closed and there is an evaluation included that does make recommendations for placement in a secure DMH facility when he was 18. Whether the court did not allow the continuation or the program actually closed is not known from the records available to this writer, but he was released.

Mr. Battista lived with his father for a short time upon his release from DYS and then moved in with a woman who was an ex-girlfriend of his father. She had two children an 11-year old girl and 10-year old boy. He lived with them until he was incarcerated for the governing offense.

## Medical/Psychiatric History:

Mr. Battista suffers from Congenital Adrenal Hyperplaysia, also known as Addison's Disease. He receives treatment in the form of medication, which he receives daily. Currently he takes "dexamethazone." In the past he has received hydrocortisone. He has been taking medication since about age 4-5.

The disease caused him to begin to grow body hair at 18 months of age. His genitals also began maturing as an infant. His mother reportedly rejected him. She would not change him or bathe him, some records indicate she refused to touch him. He was ashamed of his body and hair and indicated his childhood was further made difficult as other children would call him names and make fun of him. He indicated he was also pigeon toed, which allowed him to be excused from taking gym and suffering the public humiliation of changing for gym. He had surgery to repair his legs as a child. He reported during his interview that as he became older he was less different than anyone else was and as an adult experiences little discomfort with the disease. The disease often causes persons to be smaller than average in stature as their bones mature earlier thus they stop growing younger. Mr. Battista is slight and short in stature.

Mr. Battista received program involvement/treatment when incarcerated in DYS facilities. He has participated in one on one therapy for the last several years while in the DOC. He has never been diagnosed with a psychotic major mental illness. Evaluations consistently state that they find no evidence of a thought disorder or mental disturbance. They consistently describe him as character disordered. Therefore he has never received psychiatric treatment in the form of hospitalization or medication. This is probably the reason the Department of Mental Health (DMH) found him not appropriate for involuntary admission or commitment to a secure inpatient DMH facility when he turned 18.

In 1997, a request for a psychological evaluation was made by Victoria Russell, MD a

psychiatric consultant at MCI-Norfolk. Referral questions included assistance in "designing appropriate therapy goals and interpretations and because such tests are also given to people considering sex reassignment surgery. This was requested because Mr. Battista was requesting specialized treatment for "a sex change."

J. Tyler Carpenter, Ph.D. ABPP Consulting Staff Psychologist conducted a comprehensive psychological evaluation and provided the following description of his psychological fuctioning, structure and processing style.

*"Results described Mr. Battista as a person with average intelligence with limited ability to utilize abstract concepts, especially when it came to discussing his medical issues. He is generally able to attend and concentrate, but his judgment become impaired by strong emotions. His understanding of his milieu is grossly intact, but his understanding of his condition is somewhat superficial. He recognizes that there is something wrong with his self-image. The thinks the solution to his problem is to concretely change his anatomy to fit his fantasized identity. He has little apparent knowledge of the underpinnings of his perceptions or the full impact of these dynamics on himself or others. Mr. Battista generally appeared and acted rationally during his interviews and testing. It was his inability to reflect on alternate ways of understanding his condition and ways to deal with it that took on an irrational life of its own. At times he demonstrated some press of speech. The association of his thinking was remarkable for perseveration around his sense of being persecuted and deprived with respect to his obsession with dramatically altering his sexual appearance. His thinking is distorted by intermittent concreteness and his current preoccupation with sex reassignment surgery as a solution to all his problems reflects unrealistic fantasy and magical thinking....*

*...Predominant underlying affects are fear (of rejection and ridicule of his basic sexual identity, shame (regarding his penis and nose, e.g. both their actual form and symbol phallic meaning) and anger (at anyone who opposes his understanding of himself or thwarts his attempts to realize his fantasized solutions to his psychic pain.) These affects have their roots in classical conditioning, by his mother and peers, sub cultural conditioning in the prison environment, and psychodynamic and family systems dynamics....*

*..Mr. Battista's primary conflicts appear to center primarily around great rage and distrust of authority and poorly differentiated sexual and aggressive drives. .. His sexual conflicts are equally severe and entwined with his rage as well as anomalous in their behavioral expression. His mother was repulsed by and ridiculed the effects of his early genital development, leaving him alienated from his primary caregiver and his own sexual anatomy. It is clear that this shame over his genitals persisted well into his adulthood and appears to be intermingled with an unconscious fantasy of using his genitals in an rageful way against women. The relatively late onset of his desire to become a woman through sex reassignment surgery appears to be in part a function of his alienation from others, deep conflict over his sexual being, precipitated by an acceptance by other inmates, in an environment which by nature must place controls on sexual expression, of his experiments with crossdressing. In other words, as a lonely and angry individual who is deeply uncomfortable about his sexual being, cross-dressing helped him  deny the painful and complex conflicts, while at the same time providing stimulation, a less aggressive identity, and the deeply desired attention. Even the painful ritual of sugary would appear to be both a concrete and masochistic transformation of that which has come to be associated with shame and pain, as well as some rite of passage whereby (by (sic) ) he finally has achieved an identity he believes that he can live with. ..*

*Overt manifestations of intrapsychic issues- he has, in the past, used children as a way of bolstering his sense of himself as weak and defective. His goal of undergoing sex reassignment surgery as a solution to*

*both his perceived and apparent psychic pain and interpersonal problems, reflects a synthesis (in fantasy) of intrapsychic/interpersonal/environmental presses with a vulnerable response style, defective reality testing, and clear secondary gain within the correctional setting. The lawsuit is deeply satisfying because it is over determined. It is driven on one hand by his strong and valid desire for relief from his deep personal suffering. While on the other hand, it reflects a passive-aggressive rejection of available sources of treatment (e.g. psychotherapy for his character problems, psychopharmacotherapy for his depression, a a psycho diagnostic reformulation of his issues, and sex offender treatment for his problematic pedophiliac(sic) tendencies toward young girls), an active attack on conventional authority, and a peculiarly quixotic solution to dealing with the problems of his past, present and future. ..*

*Diagnostic Summary and Recommendations;*
*Axis I: 302.6 Gender identity disorder NOS*
      *311.00 Depressive disorder NOS*
      *R/O 294.9 Cognitive disorder NOS*
      *r/o 302.3 Transvestic Fetishism with gender dysphoria*
      *r/o 302.2 Pedophilia (attracted to females)*
      *r/o 300.7 Body Dysmorphic disorder*
      *307.50 Eating Disorder NOS*
      *305.20 Cannabis abuse - in remission due to a controlled environment*
      *305.00 Alcohol abuse- in remission due to a controlled environment*

*Axis II: 301.7 Antisocial Personality Disorder*
      *301.83 Borderline Personality Disorder*
      * with avoidant, passive-aggressive (negativistic), and schizotypal traits*

*Axis III: Congenital Adrenal Hyperplasia (CAH)*
      *a concurrent congenital physical intersex condition*

*Axis IV: Problems with the primary support group, with the social environment, and with housing.*
*Axis V: 42*

Dr. Carpenter did not find Mr. Battista imminently suicidal, but considered him vulnerable to suicide. He also recommended sex offender treatment which would (and the JRI program includes) a penile plethismograph in order to determine presence and nature of deviance arousal for diagnostic and treatment purposes. He recommended the specific and energetic attempt to develop a therapeutic alliance in order to develop a trusting resulting relationship for treatment. Lastly, he recommended a psychopharmacological consult regarding depression.

## Sexual and Developmental History:

Mr. Battista describes himself as bisexual. He indicated he had one relationship at age 18 with a woman with whom he had sex 20 times. He stated that as he got older, his body hair became less of an issue as the other boys also had body hair. He remarked however, that he was so shy he did not open his eyes. Records indicate he had told previous evaluators that he had never had sex with a female as he was too embarrassed and ashamed. He reported two consensual sexual relationships with men while incarcerated. He stated he knew this was against the rules, but that he felt it was important information. He also indicated that the men "looked more feminine than I do."

When asked, Mr. Battista indicated he was not sure if he would live his life as a female,
"I wouldn't walk out of prison in drag if that what you mean." but that he wanted to
explore a lifestyle that would include alternative life styles and clubs. He seemed unaware
or unconcerned that removal of his genitalia would make sexual behavior whether gay or
straight, limited in scope. He has a transsexual or transgender friend in the community he
says he would be able to stay with. He states this person would be a primary support for
him in the community.

Mr. Battista identifies himself as a transsexual. He has been evaluated at his own expense
by a Diane Ellaborn, LICSW, and a gender specialist. In her opinion, Mr. Battista meets
criteria for gender identity disorder. She further states that his Addison's disease is an
intersex condition frequently related to the gender identity disorder. Treatment for this
combination of issues, in her opinion, consists of surgery and cross gender hormone
treatment. Surgery would involve an orchidotomy, the removal of his penis and testes.
She also indicated this would reduce his risk of reoffending. He indicated a strong
willingness to submit to the surgery.

He provided this evaluator with several newspaper articles related to his desire for this
surgery to take place prior to his release. Apparently he contacted them in an effort to
solicit the assistance of the media in his cause . Although he clearly stated during this
interview that he would have the surgery at his expense, the articles focused on
"taxpayers paying for a sex offender's surgery." Mr. Battista also indicated he dismissed
his attorney because the attorney was unwilling to move forward on his insistence that the
court allow/order the surgery. Mr. Battista wanted it to become a part of this proceeding
in that he would submit to the surgery as part of his release.

Records indicate Mr. Battista wore his sister's underwear and clothes as a child. He
currently presents in a feminine fashion. He has changed his name to a more feminine,
but still androgenous one. He plucks his eyebrows and shaves his body hair. He has
tattooed a mole above his upper lip. He stated he altered his sweatpants to make them
form fitting.Records indicate he binds his genetals and has attempted to freeze them and
tie them off in order to rid himself of them. He refers to himself in the feminine. He
remarks that his feminine presentation has caused him a great deal of trouble in prison
related both to his charges and his appearance. He has been transferred a great deal, 14
times primarily due to enemy issues or frequent d-reports, which he admits were
manipulations of the system at times. He has also received 63 disciplinary (d) reports,
which in some cases were related to his appearance. He has requested makeup and
women's undergarments while incarcerated. This was denied due to the
"inappropriateness (of it) in a male prison institution." He has received d-reports for his
appearance on occasion.

Mr. Battista's record indicates that between the ages of 12 and 14 he was involved in
sexual activity with female family members. Two incidents were noted. No details were
given, but the suggestion is that they led to his grandmother and later his father seeking

placement outside the home for him. When asked about previous sexual offenses by this writer, he replied that the assault and battery that led to his DYS commitment was actually sexual in nature. He indicated he intended to rape her. His adolescent records indicate he made statements at the time that the three girls he assaulted "deserved it."

## Military History:

Mr. Battista served in the military for four months. He was discharged due to "fighting and drinking." Records indicate when intoxicated, a pipe was thrown by Mr. Battista during a fight and hit someone. Records also state that graduating from boot camp was the one time he felt his father felt proud of him.

## Educational History:

Mr. Battista received his GED in 1982 to gain entrance into the military. He retook the test twice since then while incarcerated. He received a higher score the second time in 5/2001. He is clearly proud of his self-education process regarding his use and application of the law library. He remarked that he had been told he had the equivalent of an associate's degree by his presentation. He indicated a desire to receive a paralegal degree and work in a law office. He was demonstrated a realistic view of his situation while discussing his plans for employment. He appears to be of average intelligence

## Employment History:

Mr. Battista has been employed in service related positions, such as McDonald's, factory and warehouse work. He does not currently hold a valid driver's license, but states he is eligible. According to classification forms he was employed during his incarceration. His records indicate he needed to work as he was supporting himself, as his family did not send money.

## Substance Abuse:

Mr. Battista used alcohol and marijuana. Mr. Battista denied using other drugs. He stated that he has used alcohol the day before the governing offense and that he had smoked marijuana prior to the offense. He does not believe he has a drug or alcohol problem.

## Criminal History:

Mr. Battista has a significant juvenile record. In March 1977, at age 15, he was arrested and charged with assault and battery. He grabbed a 10-year-old girl at the bus stop and took her to the woods. He was planning on sexually assaulting he when a neighbor intervened. He himself indicated the assault was sexual in nature, however, it was brought forward as an assault and battery. He also has juvenile charges of breaking and entering with his brother.

The official version of the governing offense involved a 10-year-old girl who was selling fudge door to door. He watched her for a while and admits to trying to trick her to get her close to his car. He stated to the evaluator hired for this proceeding and his defense attorney , that she was young, blonde and innocent. He indicated to the girl that his mother wanted some fudge and that his wallet was in the car. The girl came to the car and he grabbed her covered her mouth and put her in the car. The car had no handle or latch on the inside passenger side door. He took her to a wooded area tied and gagged her and took off her clothes. He removed his clothes and placed his penis on her vagina. He penetrated her with his fingers and required her to performed oral sex on him. He next had her masturbate him. He ejaculated into her face and hair. He then let her go, taking the $16.00 she had obtained by selling fudge.

Reports indicate statements he made that suggested he felt he was not going to get caught. Other records indicate he expected to get caught. The police stopped him several days later due to a motor vehicle issue. He did not realize he was being considered for the governing offense until he was held and a second interrogation involving questions regarding the rape were initiated.

Mr. Battista stated he had been living in an unhealthy environment as the 11-year-old girl he had been living with and her friends had "crushes" on him. He was sexually attracted to the girls, (he denies sexual contact with them) and felt out of control regarding the need to act out sexually. He stated he was unable to stop himself. He was unable to identify any other issues present at that time.

During this incarceration, in July 1996, Mr. Battista was found guilty of two counts of assault and battery against a guard. He bit an officer during an escort after a fight involving several inmates. The guilty findings were filed.

Two charges for breaking and entering at night were initially presented at a bench trial. He was sentenced to one year. Mr. Battista appealed it and a jury of six upheld the original finding and sentence.

There appear to be two warrants still open in Uxbridge District Court regarding property violation and breaking and entering at night. Arraignment dates were September 30, 1981.

Mr. Battista's juvenile record consists of the sexualized assault and battery offense previously described as well as a DYS commitment for larceny from a person occurring seven months later.

## Institutional Adjustment:

Mr. Battista has had as many as 22 enemies listed on his classification form. He has

received 63 disciplinary (D) reports during his 20-year incarceration. His most recent report was for destroying state property on 11/8/01 while at the MTC . He had placed holes in a sheet and attached laces so that it would act as a fitted sheet and stay on his mattress better. He received a report on 9/25/01 for fighting with another inmate. The report stated he admitted he started the fight by punching the other inmate in the head. He has many reports for insolence or verbal altercations with officers or not following the rules. He had also had possession of a tattoo gun. He himself has many tattoos.

He has two escapes noted on his record. While housed at the Hampshire County House of Correction for nearly two years 5/16/86 - 3/31/88 he received two serious reports. He was caught attempting to escape and was found in possession of a saw and of having nearly cut through several bars. He also was in possession of a workable window key made out of a comb. Records indicate he believed this was the only way he could get around his sentence. He indicated during our interview that his continuous attempts to have his case and sentence reviewed and appealed were only to reduce his sentence not to avoid responsibility. He also escaped from a DYS program in October 12, 1977.

The second significant d report received 10/16/86 at the Hampshire County House of Correction involved his making obscene telephone calls to young girls. He admitted to these incidents during our interview and his descriptions were consistent with official versions and stated, "they were a long time ago."

He was denied parole six times due to the seriousness of his crimes and his institutional adjustment.

## Victim and Perpetrator Characteristics:

Mr. Battista appears to have a longstanding pattern (since adolescence) of sexual arousal to pre-pubescent females. He currently denies arousal. He has never had positive, stable adult relationships other than perhaps recently with two siblings who have been estranged for a long period. He has a friend with similar gender identification issues on the outside, but it is not clear the depth, nature or length of their relationship.  He appears to have been preoccupied with young girls and had fantasies at the time of the crime, continuing at least three years into his incarceration. He demonstrated compulsion and impulsivity at the time of the governing and juvenile offenses. He used force. He used trickery to gain access to one victim. The victims were strangers, although initial records indicate the first two victims were within the family constellation. He continued to contact prepubescent girls by telephone and was caught while incarcerated for the governing offense. He was aroused and ejaculated. He noted to treaters that he was attracted to "10-year-old girls, innocent with no breasts." He minimizes and distorts his behavior. He has not ceased his sexual behavior while incarcerated. He continues to present with inconsistent information. He has a history of non-criminal offenses.

The victims have all been female and around the age of 10. The first two victims were

family members. The others were strangers.

## Course of Treatment:

Mr. Battista attended Sex Offender Treatment while in the Correctional System during his
incarceration. He stated that when the JRI program was instituted in 1994 the inmates
were told they needed to sign up for group treatment or they would be in danger of losing
the individual treatment, so he signed up. In 1998, he requested and was granted transfer
to the MTC for treatment. He was passed in phase one, however, due to his disciplinary
issues and his minimal level of participation in treatment, he was sent to Gardner in
October 1999. He reports having participated in individual treatment for his other issues
through mental health services. He reports he finds this helpful.

Mr. Battista indicated he began treatment immediately upon his transfer to the MTC in
2001. Records indicate he requested "..to start now, not one or two weeks from now."

Mr. Battista's record contains a posttest for phase one. He completed the test with
minimal responses although he did receive some positive feedback.

Mr. Battista provided this writer with a copy of his comprehensive relapse prevention
plan recently developed, February 2002. He evidently presented it to his therapist who
reviewed it and provided him with feedback. The therapist, David Cerce, indicated that
overall it demonstrated a good understanding of the concepts involved in a deviance cycle
and relapse prevention plan. He suggestions for further work involved increasing the
detail and depth of the individualized issues regarding his offending. One suggestion
involved moving treatment up on his list of priorities.

Mr. Battista has not participated in phase three, which focuses on directly addressing a
multiple levels of denial. This is accomplished through group work and eventual approval
by the group and the therapist of the individual's version of the offense. The resident is
then passed on to phase four to work on the individual deviance cycle and comprehensive
relapse prevention plan.

During our interview he provided a consistent, but superficial version of his offense. He
has issues with Dr. Feldman's report and his belief that she did not believe him or review
records he proffered that would indicate that he did not penetrate the victim vaginally. He
denied currently being aroused by adolescent or prepubescent girls, although he
recognizes them as high risk and his need to stay away from them.

## Legal Standard for Sexually Dangerous Person:

Massachusetts General Laws, Chapter 123A, Section 1 defines a Sexually Dangerous
Person as, "any person who has been convicted of (, ) or adjudicated delinquent of
youthful offender by reason of (,) a sexual offense and suffers from a mental abnormality

or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility."

The Law defines the term "mental abnormality" as a, "congenital or acquired condition of a person that affects the emotional/volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes that person a menace to health and safety of other persons."

A "personality disorder" is defined by Law as a "congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses."

## Summary Assessment:

Mr. Battista has been convicted of a sex offense.

He has minimally participated in recommended sex offender treatment.

Mr. Battista has received several significant disciplinary reports for, escape, fighting, assault on a guard resulting in charges and a guilty filing, and for making obscene telephone calls to young girls while incarcerated.

Mr. Battista has had a significantly abusive, neglectful, violent and chaotic childhood and development.

Mr. Battista experiences a genetic medical condition, Addison's disease, which may effect his sexual identity. He suffers from a gender dysphonic disorder, which may be in part caused by his gender disorder. He is a bisexual transsexual.

Mr. Battista has a significant history beginning in childhood of displaying behavior that demonstrates that he has arousal, fantasy and behavior surrounding sexual activity with pre-pubescent females. In my opinion, Mr. Battista meets diagnostic criteria for Pedophilia.

In my opinion, Mr. Battista meets diagnostic criteria for antisocial personality disorder (APD).Mr. Battista has a significant history beginning in childhood of displaying behavior that suggests that he has a persistent, repetitive, and enduring pattern of a lack of regard for the rights, property and person of another.

In APD four areas of behavior are assessed. First, he demonstrates behavior prior to age 15 that meets diagnostic criteria for conduct disorder, second, there is no data that support that the behaviors in question occurred during a psychotic episode, third, he is currently over the age of 18 and fourth, he demonstrates a consistent pattern of deceit, disregard for social norms, reckless disregard for the safety of himself and others, consistent irresponsibility, a lack of remorse, impulsivity, aggressiveness and irritability.

Factors identified through research on sexual recidivism and currently fairly generally accepted involve those that can be roughly broken down in two categories, known as static and dynamic factors. Several of these factors have been associated with an increased likelihood of sexual recidivism (to be differentiated from general violent recidivism) and are noted by Hanson, R.K. and Bussiere, M.T. in their 1998 article "Predicting Relapse a Meta Analysis of Sexual Offender Recidivism." While there are some very legitimate criticisms regarding research on this topic too extensive to be discussed in this report, the following factors have been associated with recidivistic sexual violence.

Static factors (that are considered unchangeable) generally associated with increased risk of sexual recidivism include: past criminal history, prior sex offenses, antisocial personality disorder, stranger victims, a diagnosis of pedophilia, male versus female child victims and age at time offending behavior began.

In this case, static factors associated include prior criminal and prior offenses sexual in nature, stranger offenses, young when sexual offending behavior began and a diagnosis of pedophilia. These factors generally do not change.

Dynamic factors (those that are changeable) associated with increased risk of sexual offense recidivism include: the age of offender (child molesters risk for recidivism does not significantly decrease as their age increases) the influence of substances, an absence of stable adult relationships, the presence of cognitive distortions, single/never married marital status, deviant sexual arousal, high degree of sexual preoccupation with children, minimal or inadequate treatment history, an absence of probation conditions.

Mr. Battista presents with several dynamic risk factors; an absence of stable adult relationships, presence of cognitive distortions, single/never married status, deviant sexual arousal (to female children), a high degree of sexual preoccupation with children, minimal and inadequate treatment history and an absence of probation conditions.

## Conclusions and Recommendations:

Mr. Battista has been convicted of a sex offense.

In my opinion, Mr. Battista meets diagnostic criteria for Pedophilia and Antisocial Personality Disorder as defined in the DSM-IV- TR (Diagnostic and Statistical Manual, Edition IV widely used by mental health professionals to aid in diagnosis). In my opinion, these disorders meets statutory criteria for mental abnormality and for personality disorder.

Mr. Battista presents with high-risk characteristics. He has not acted out in a pedophilic fashion while incarcerated. Pedophilia is a chronic disorder and his victim pool has not

been available to him. This choice in sexual victim occurred as an adolescent and as an adult. He has not received significant treatment on this issue. Although he demonstrates the ability to accept responsibility for the facts, he presents a consistent and over all pattern of reducing and minimizing the details of all the significant issues in his life and their impact on him. This includes the offenses and well as his mother's death, father's violence and alcoholism and violence and abuse by his maternal family members.

In Mr. Battista's life, anger, violence and sexual behavior have been fused. Additionally, due to his genetic disorder and physical disfigurements (his legs), his self esteem and body image as a person have experienced significant injury. He was socially isolated, sexually inadequate and probably violent as a result. His environment was chaotic, abusive, sexually charged with no clear boundaries present. He has never had stable, positive adult role models present in his life. He appears to rationalize and minimize these very significant issues as a psychological defense against this very sad history. His assaults have been violent, impulsive and sexual in nature. He has continued to display significant aggressive, violent and impulsive behavior during his incarceration in the absence of a victim pool.

Mr. Battista is more able to discuss in some depth issues related to his genetic medical disorder. There maybe some biological basis as well as his psychological dysphoria (discomfort) he experiences related to his gender identity. It appears that he has a longstanding pattern beginning in childhood of cross dressing and other related experiences associated with his transsexualism. He clearly has a complex network of issues related to this, which he needs to work through. He has made what appears to be a very sincere offer to have his genitals removed to accomplish the dual task of beginning gender reassignment and reduce sex offending risk. In his zeal to accomplish this he has dismissed an attorney for not further pursuing an order to have this done.

The issues related to gender reassignment in the United States include an extensive battery of psychological tests, extensive lifestyle requirements, which are required prior to reassignment being considered. His history of sexual offense will be a significant hurdle to climb if not disallowed for this reason alone. The process is long and many factors are addressed as the person progresses to the eventual surgical procedure. He has indicated he would probably go to Thailand to have the surgery as it costs less, about $3500.00. Mr. Battista has the financial ability to accomplish this.

Mr. Battista states he is bisexual and spoke with candor about his arousal toward women. He made statements that suggest some confusion regarding his sexual preference versus his gender identity. Although none of his statements were mutually incompatible, he will need to come to grips with some of the competing statements. He is attracted to females and males. He is not sure if he would live as a woman. This would be required as part of the gender reassignment. He would be willing to remove his genitals without being clear regarding what use they may or may not have for him as he has had very limited sexual experience outside of prison. He also gave contradictory information regarding whether

has actually had sex with a female. What is important is not whether he did or not but what is the truth and why he would be unable to present this consistently.

Mr. Battista also presents with two chronic mental disorders, pedophilia and antisocial personality disorder. He has not received treatment for what appear to be, in his case, severe and complex disorders.

Mr. Battista has a history of sex offending behavior beginning as a juvenile. He also has demonstrated aggression and impulsivity. He has demonstrated a sexual preoccupation with prepubescent female children. This preoccupation in the past has led to sexual violence toward children. He minimizes responsibility in any of the incidents, therefore he demonstrates minimal insight or remorse.

In my opinion, due to the nature of the risk factors present and his general overall pattern antisocial behavior he would be likely to re-offend in a sexual manner.

In my opinion, Mr. Battista requires a secure facility at this time.

In my opinion, Mr. Battista currently meets criteria as a sexually dangerous person.

Respectfully Submitted,

Katrin Rouse, Ed.D.
Licensed Clinical Psychologist
Designated Forensic Psychologist
Qualified Examiner
Consulting Psychologist